# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CALLEN DEMPSTER et al.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-95** |
| **LAMORAK INSURANCE CO. et al.** | **SECTION: "G"(1)** |

## ORDER AND REASONS

In this litigation, Plaintiffs Tanna Faye Dempster, Steven Louis Dempster, Janet Dempster Martinez, Marla Dempster Loupe, Callen Dempster, Jr., Annette Dempster Glad, and Barnett Dempster's (collectively, "Plaintiffs") allege that Decedent Callen L. Dempster ("Decedent") was exposed to asbestos and asbestos-containing products that were designed, manufactured, sold, and/or supplied by a number of Defendant companies while Decedent was employed by Huntington Ingalls Incorporated ("Avondale").[1] Pending before the Court is Defendant's Bayer CropScience, Inc., as Successor to Rhone-Poulenc AG Company, f/k/a Amchem Products, Inc., f/k/a Benjamin Foster Company's ("Amchem") "Motion to Exclude Tests Performed by Dr. James Millette on Benjamin Foster Products and Any Exposure Testimony Based Thereon."[2]

---

[1] *See* Rec. Doc. 1-2; Rec. Doc. 1-8. On August 6, 2020, Tanna Faye Dempster, Steven Louis Dempster, Janet Dempster Martinez, Marla Dempster Loupe, Callen Louis Dempster, Jr., Annette Ruth Dempster Glad, and Barnett Lynn Dempster were substituted as plaintiffs for Louise Ella Simon Dempster. Rec. Doc. 239. Plaintiffs bring claims against Lamorak Insurance Company, Huntington Ingalls Inc., Albert Bossier, Jr., J. Melton Garrett, Eagle, Inc., Bayer Cropscience, Inc., Foster-Wheeler LLC, General Electric Co., Hopeman Brothers, Inc., McCarty Corporation, Taylor-Seidenbach, Inc., CBS Corporation, Uniroyal, Inc., International Paper Company, Houston General Insurance Company, Berkshire Hathaway Specialty Insurance Company, Northwest Insurance Company, United Stated Fidelity and Guaranty Company, Fist State Insurance Company, The American Insurance Company, Louisiana Insurance Guaranty Association, and the Traveler's Indemnity Company. Rec Doc. 1-8 at 2–3.

[2] Rec. Doc. 47.

Defendants Foster Wheeler, LLC and General Electric Company join the motion.[3] Plaintiffs oppose the motion in limine.[4] Considering the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court denies the motion.

## I. Background

In this litigation, Plaintiffs allege that Decedent was employed by Avondale from 1962 to 1994.[5] During that time, Plaintiffs aver that Decedent was exposed to asbestos and asbestos-containing products in various locations and work sites, resulting in Decedent breathing in asbestos fibers and later developing asbestos-related cancer.[6] Plaintiffs assert strict liability and negligence claims against various Defendants.[7]

Decedent filed a "Petition for Damages" in the Civil District Court for the Parish of Orleans, State of Louisiana, on March 14, 2018.[8] Defendants Huntington Ingalls Incorporated, Albert Bossier, Jr., J. Melton Garret, and Lamorak Insurance Company (the "Removing Parties") removed the case to the United States District Court for the Eastern District of Louisiana for the first time on June 21, 2018.[9] On January 7, 2019, this Court remanded the case to the Civil District Court for the Parish of Orleans.[10]

Decedent passed away on November 24, 2018, and a First Supplemental and Amending

---

[3] Rec. Doc. 57.

[4] Rec. Doc. 147.

[5] Rec. Doc. 1-2 at 5.

[6] *Id.*

[7] *Id.* at 7–8.

[8] *Id.* at 2–3

[9] Case No. 18-6158, Rec. Doc. 1 at 2.

[10] Case No. 18-6158, Rec. Doc. 89.

Petition for Damages was filed in state court substituting Decedent's heirs as Plaintiffs on January 17, 2019.[11] Trial was scheduled to begin before the state trial court on January 13, 2020.[12] However, on January 9, 2020, Avondale removed the case to the United States District Court for the Eastern District of Louisiana for a second time.[13] On January 28, 2020, the Court denied the motion to remand, finding that this case was properly removed to this Court under the federal officer removal statute.[14]

On February 24, 2020, Amchem filed the instant motion in limine.[15] Defendants Foster Wheeler, LLC and General Electric Company join the motion.[16] On March 17, 2020, Plaintiffs filed an opposition to the instant motion.[17] On May 5, 2020, the Court continued the May 18, 2020 trial date due to COVID-19.[18]

## II. Parties' Arguments

### A.      Amchem's Arguments in Support of the Motion

Amchem moves the Court to issue an order excluding certain tests conducted by Dr. James Millette on a Benjamin Foster product called "Benjamin Foster 81-27 adhesive" and any testimony based on those tests.[19] Amchem states that Dr. Millette conducted tests on Benjamin

---

[11] Rec. Doc. 1-8.

[12] Rec. Doc. 1-12.

[13] Rec. Doc. 1.

[14] Rec. Doc. 17.

[15] Rec. Doc. 47.

[16] Rec. Doc. 57.

[17] Rec. Doc. 147.

[18] Rec. Doc. 225.

[19] Rec. Doc. 47-1 at 1.

Foster 81-27 adhesive in 2003 and formed opinions regarding the propensity of Benjamin Foster 81-27 adhesive to release asbestos fibers and whether Decedent may have been exposed to fibers released from Benjamin Foster 81-27 adhesive.[20] However, Amchem contends that those tests and the related testimony fail both the relevance and reliability requirements for the admissibility of expert evidence.[21]

Amchem argues that Dr. Millette's opinions are not relevant because the tests do not fit the facts of this case.[22] For example, Amchem contends that in curing the Benjamin Foster 81-27 adhesive, Dr. Millette heated the adhesive to 220°F for 5 hours.[23] However, Amchem argues that Dr. Millette does not know if Benjamin Foster 81-27 adhesive was ever exposed to temperatures that high.[24] Furthermore, Amchem contends that Dr. Millette admitted that the results of his tests might have been different had the adhesive had not been heated to 220 degrees.[25] Amchem contends that Dr. Chris Scott, a scientist who oversaw the remaking of the products tested by Dr. Millette, opined that it would not be scientifically correct to extrapolate the results of a test from an improperly cured sample to the results from a properly cured sample.[26] Additionally, Amchem argues that while Benjamin Foster 81-27 adhesive can be resuspended if it dries on the ground and is subsequently walked on or swept up, Dr. Millette did not perform any tests on the dried

---

[20] *Id*. at 2.

[21] *Id*.

[22] *Id*. at 9.

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] *Id*. at 9–10 (citing Rec. Doc. 47-4).

adhesive.[27] For these reasons, Amchem contends that Dr. Millette's tests have no relevance to the facts of the case at hand.[28]

Next, Amchem argues that Dr. Millette's opinions are not reliable because he failed to follow established scientific protocol.[29] For example, Amchem argues that the relevant American Society of Testing Materials ("ASTM") standard provides that materials such as Benjamin Foster 81-27 adhesive should be cured for a day between 60 and 80 degrees, and then cured in an oven at approximately 150 degrees.[30] Amchem contends that heating the adhesive to 220 degrees "could have resulted in changes in the products that would have degraded their mechanical properties, and could have affected the results of Dr. Millette's fiber release testing."[31] Because Dr. Millette has provided no basis for departing from the applicable ASTM standard, Amchem argues that neither Dr. Millette nor any other expert can rely on his test results.[32]

Additionally, Amchem argues that Dr. Millette utilized a "glove box," a small, sealed enclosure with openings where the tester's hands can be inserted, for all but one of his tests.[33] According to Amchem, there is no reliable scientific methodology for extrapolating glove box test results to personal exposure estimates and the glove box tests did not adhere to any recognized testing protocol.[34] Amchem argues that while the Environmental Protection Agency ("EPA") and

---

[27] *Id*. at 10.

[28] *Id*.

[29] *Id*.

[30] *Id*. at 11.

[31] *Id*.

[32] *Id*. at 12.

[33] *Id*. at 13.

[34] *Id*.

Consumer Product and Safety Commission ("CPSC") each outlined "general protocols" for glove box testing in reports, there was no specific protocol for setting up the glove box testing.[35] Furthermore, Amchem contends that the EPA and CPSC glove box tests did not measure personal exposure to airborne asbestos, but instead studied whether asbestos would be released from certain products.[36] Amchem argues that the EPA study specifically cautioned that further analysis was necessary before any predictions could be made about personal breathing zone exposures to asbestos based on their glove box tests.[37] Amchem contends that there is no reliable scientific basis for making the connection between the results of the glove box tests and Decedent's breathing zone exposures.[38] Amchem argues that Dr. Millette "admits that the glove box tests only allow him to establish maximum possible exposure and that he does not know how much lower the exposure could have been."[39] Therefore, Amchem contends that the glove box tests are unreliable.[40]

Next, Amchem argues that Dr. Millette's room scale test is also unreliable because the filters used in that test indisputably were overloaded.[41] Specifically, Amchem contends that Dr. Millette acknowledged that his research technician merely estimated the level of asbestos fibers, because the filters were overloaded, and an accurate count could not be made.[42] Additionally,

---

[35] *Id.*

[36] *Id.*

[37] *Id.* at 14 (citing Rec. Docs. 47-5, 47-6 ("Means should be developed for relating the data provided by this technique [glove box tests] to worker and environmental exposures.")).

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.* at 15.

[42] *Id.*

Amchem argues that Dr. Millette conceded that the overloading on the filters would have included not only asbestos, but also non-asbestos particulates, including sodium silicate.[43] Amchem contends that the National Institute for Occupational Safety and Health ("NIOSH") has established a protocol for this type of analysis.[44] Amchem contends that Dr. Millette did not follow the NIOSH 7400 protocol requirements, as neither NIOSH 7400, nor the related NIOSH 7402, allows for the estimation of fiber concentrations on overloaded filters.[45]

Finally, Amchem argues that Dr. Millette's own quality-control measures demonstrate errors that render his test results unreliable.[46] Amchem contends that Dr. Millette sent portions of six air filters to Clayton Laboratory ("Clayton"), an outside service who performed repeat PCM analyses as a means of quality control.[47] Amchem argues that NIOSH 7400 provides guidelines for the permitted degree of statistical variation between the original and repeat tests.[48] Amchem contends that Clayton's results for all six samples were substantially different from Dr. Millette's results and that three of the six samples fell outside the NIOSH 7400 statistical parameters for repeat tests.[49]

Amchem argues that studies performed solely for litigation purposes call for heightened scrutiny under *Daubert*.[50] Amchem contends that peer review is the primary method by which an

---

[43] *Id.*

[44] *Id.* at 16.

[45] *Id.* at 15–16.

[46] *Id.* at 16.

[47] *Id.* at 17.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 18.

expert satisfies this scrutiny and here, Dr. Millette has never subjected these tests to peer review.[51]

Amchem argues that because Dr. Millette's unpublished tests were conducted solely for the

purposes of litigation, they should be excluded.[52]

**B.      Plaintiffs' Arguments in Opposition to the Motion**

Plaintiffs argue that Amchem's motion should be denied.[53] First, Plaintiffs contend that

other courts have considered identical motions to the motion in limine filed here, and no court

has ever excluded Dr. Millette from testifying about his test results of Benjamin Foster 81-27

adhesive.[54]

Next, Plaintiffs argue that just because Dr. Millette's testing was done in connection with

litigation does not make it unreliable.[55] Plaintiffs contend that defendants in asbestos litigation

are paid more to perform studies to be utilized in connection with litigation.[56] In response to

Amchem's argument that  Dr. Millette's tests do not fit the facts of this case, Plaintiffs argue that

Dr. Millette tested the actual Benjamin Foster product that Decedent was using at Avondale.[57]

Furthermore, Plaintiffs argue that Dr. Millette tested the specific activities, the scraping of the

material off of his clothing and removal with a hammer, that exposed Decedent to fibrous

adhesives.[58]

---

[51] *Id.*

[52] *Id.* at 19.

[53] Rec. Doc. 147 at 1.

[54] *Id.* at 2 (citing Rec Docs. 147-6, 147-7, 147-36).

[55] *Id.* at 3.

[56] *Id.* at 4.

[57] *Id.* at 5.

[58] *Id.*

Plaintiffs contend that Dr. Millette's testing is relevant and fits the facts of this case.[59] Plaintiffs argue that Dr. Millette performed testing on the scraping and sanding of Benjamin Foster 81-27 adhesive because Decedent and other Avondale employees testified that after the adhesive dripped on their clothing, it had to be scraped off, which created dust.[60] Plaintiffs contend that Dr. Millette testified that this process would have resulted in Decedent's exposure to asbestos.[61] Plaintiffs argue that as a world-renowned expert in the areas of fiber release of asbestos from products, Dr. Millette is well qualified to offer opinions on fiber release.[62]

Plaintiffs contend that Dr. Millette's methodology satisfies the *Daubert* factors.[63] Plaintiffs argue that the first factor, testability, is satisfied because his testing was videotaped and therefore could be replicated.[64] Additionally, Plaintiffs contend that Dr. Millette utilized the protocols for similar tests conducted for the Consumer Products Safety Commission and the United States Environmental Protection Agency and used the standard NIOSH 7400 method and the standard NIOSH 7402 method to analyze the air samples.[65] Plaintiffs argue that the next factors concern whether the theory or technique has been subjected to peer review or publication and whether the theory or technique is generally accepted in the scientific community.[66] Here, Plaintiffs contend that Dr. Millette used the NIOSH 7400 method in conducting the PCM analysis

---

[59] *Id*. at 6.

[60] *Id*. at 7.

[61] *Id*.

[62] *Id*. at 14.

[63] *Id*. at 16.

[64] *Id*.

[65] *Id*. at 16.

[66] *Id*. at 17.

and the NIOSH 7402 method in conducting the TEM analysis, just as Amchem's expert did.[67] Additionally, Plaintiffs argue that Dr. Millette has published in this area, as he has written a book chapter on "Asbestos Analysis Methods."[68]

Plaintiffs contend that Amchem's claim that Dr. Millette heated the adhesive to 220 degrees is false because he did not heat the product during the denim test.[69] Furthermore, Plaintiffs argue that the Service Temperature Limits for Benjamin Foster 81-27 adhesive is between 50 degrees and 800 degrees.[70] Plaintiffs contend that Amchem's corporate representative testified that Benjamin Foster 81-27 adhesive was designed for use in high-temperature applications and that the strength of the adhesive would not be affected at 220 degrees.[71] Lastly, Plaintiffs argue that Dr. Millette's test was done in accordance with Foster Standard Test Method 70.[72]

Regarding Amchem's arguments about the glove box, Plaintiffs contend that Dr. Millette's procedure regarding the glove box was modeled after the standard protocol set forth by the Consumer Product and Safety Commission and the Environmental Protection Agency in their testing of asbestos products.[73] Plaintiffs argue that the glove box tests show whether asbestos would be released from certain products, which is precisely the determination the jury will be asked to make because Amchem avers that its products are encapsulated and do not release

---

[67] *Id.*

[68] *Id.* at 17–18.

[69] *Id.* at 18.

[70] *Id.* at 19 (citing Rec. Doc. 147-25).

[71] *Id.* at 19–20 (citing Rec. Doc. 147-27).

[72] *Id.* at 20.

[73] *Id.* at 21.

fibers.[74] Plaintiffs contend that Amchem's expert's opinion that the tests conducted by Dr. Millette do not represent the way in which workers handle these products and are therefore not representative of likely exposures is untrue.[75]

Plaintiffs argue that Amchem's arguments regarding the room scale test are also without merit.[76] Plaintiffs contend that the fact that a filter is overloaded does not invalidate the study and NIOSH does not prohibit the reporting of a fiber concentration when a filter is overloaded.[77] Plaintiffs argue that there is nothing unusual about the discrepancy between Clayton's sampling and Dr. Millette's sampling.[78] Plaintiffs contend that Clayton's findings still showed significant fiber release from Benjamin Foster's products and that if Amchem believes Dr. Millette's conclusions are wrong, they can cross examine him at trial.[79]

### III. Legal Standard

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[80] Rule 702, which governs the admissibility of expert witness testimony, provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education," may testify when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[81] For the testimony to

---

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.* at 22.

[78] *Id.* at 23.

[79] *Id.*

[80] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[81] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

be admissible, Rule 702 establishes the following requirements:

> (1) the testimony [must be] based on sufficient facts or data,

> (2) the testimony [must be] the product of reliable principles and methods, and

> (3) the expert [must reliably apply] the principles and methods to the facts of the case.[82]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable."[83] The court's gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[84] The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid.[85] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[86]

In *Daubert*, the Supreme Court identified a number of factors that are useful in analyzing reliability of an expert's testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and

---

[82] Fed. R. Evid. 702.

[83] *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

[84] *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

[85] *See Daubert*, 509 U.S. at 592–93.

[86] *See id.* at 590.

(5) general acceptance within the scientific community.[87] In *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert*'s list of specific factors does not necessarily nor exclusively apply to every expert in every case.[88] The overarching goal "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[89] The court must also determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence—in other words, whether it is relevant.[90]

A court's role as a gatekeeper does not replace the traditional adversary system,[91] and "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[92] As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[93] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[94]

---

[87] *See id.* at 592–94.

[88] *Kumho Tire*, 526 U.S. at 142; *see also Seatrax*, 200 F.3d at 372 (explaining that reliability is a fact-specific inquiry and application of *Daubert* factors depends on "nature of the issue at hand, the witness's particular expertise and the subject of the testimony").

[89] *Kumho Tire*, 526 U.S. at 152.

[90] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[91] *See Daubert*, 509 U.S. at 596.

[92] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[93] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[94] *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir.1996) (internal citations and quotation marks omitted).

## IV. Analysis

In the instant motion, Amchem seeks to exclude Dr. Millette's proposed testimony for two reasons: (1) Dr. Millette's opinions are not relevant because the tests he conducted do not fit the facts of this case; and (2) Dr. Millette's proposed testimony is not based on a reliable methodology. The Court addresses each argument in turn.

### A.     Fit of the Tests

First, Amchem argues that Dr. Millette's opinions are not relevant because Dr. Millette heated the Benjamin Foster 81-27 adhesive to 220 degrees Fahrenheit for 5 hours while curing the adhesive, despite not knowing if it was ever exposed to temperatures that high.[95] In response, Plaintiffs argue that Dr. Millette's testing is relevant because he replicated the process—scraping the adhesive off of material—that Decedent performed at Avondale.[96]

The "fit" prong of the *Daubert* examination requires that there be a valid scientific connection to the facts of the case.[97] This ensures that the expert witness will assist the trier of fact. Dr. Millette performed testing on the scraping, sanding, hammering, chiseling, and removing of Benjamin Foster 81-27 adhesive.[98] Decedent testified that Benjamin Foster 81-27 adhesive dripped on his clothing and had to be scraped off, creating dust.[99] Dr. Millette testified that this process would have resulted in Decedent's exposure to asbestos.[100] Therefore, Dr. Millette's testing of scraping and sanding Benjamin Foster 81-27 adhesive fits the facts of this case.

---

[95] Rec. Doc. 47-1 at 9.

[96] Rec. Doc. 147 at 7.

[97] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[98] Rec. Doc. 147-31 at 2–3.

[99] Rec. Doc. 147-2.

[100] Rec. Doc. 147-28.

Amchem may bring out any differences between curing Benjamin Foster 81-27 adhesive at 220 degrees and curing it at a lower temperature on cross-examination or through its own witnesses.

**B.    *Reliability***

Next, Amchem argues that Dr. Millette's opinions are not reliable.[101] Amchem argues that the relevant standard provides that materials such as Benjamin Foster 81-27 adhesive should be cured for a day between 60 and 80 degrees, and then cured in an oven at approximately 150 degrees, not at 220 degrees.[102] Additionally, Amchem argues that Dr. Millette's use of a "glove box" does not adhere to any recognized testing protocol.[103] Amchem also argues that Dr. Millette's room scale test is unreliable because the filters used in that test indisputably were overloaded.[104] Finally, Amchem argues that Dr. Millette's own quality-control measures demonstrate errors that render his test results unreliable.[105] Specifically, Amchem contends that Clayton's results for all six samples were substantially different from Dr. Millette's results and that three of the six samples fell outside the NIOSH 7400 statistical parameters for repeat tests.[106]

First, Amchem takes issue with Dr. Millete's decision to heat Benjamin Foster 81-27 adhesive to 220 degrees.[107] Amchem argues that the relevant American Society of Testing Materials ("ASTM") standard provides that materials such as Benjamin Foster 81-27 should be cured for a day between 60 and 80 degrees, and then cured in an oven at approximately 150

---

[101] Rec. Doc. 47-1 at 10.

[102] *Id*. at 11.

[103] *Id*. at 13.

[104] *Id*. at 15.

[105] *Id*. at 16.

[106] *Id*.

[107] Rec. Doc. 47-1 at 11.

degrees.[108] However, Amchem's corporate representative testified that Benjamin Foster 81-27 adhesive was designed for use in high-temperature applications.[109] As discussed above, Amchem may bring out any differences between curing Benjamin Foster 81-27 adhesive at 220 degrees and curing it at a lower temperature on cross-examination or through its own witnesses. Accordingly, Dr. Millette's decision to heat Benjamin Foster 81-27 adhesive to 220 degrees does not render his tests unreliable and thus does not mandate exclusion.

Next, Amchem argues that Dr. Millette's use of a "glove box" does not adhere to any recognized testing protocol.[110] Plaintiffs contend that Dr. Millette's procedure regarding the glove box was modeled after the standard protocol set forth by the Consumer Product and Safety Commission ("CPSC") and the Environmental Protection Agency ("EPA") in their testing of asbestos products.[111] Amchem argues that while the EPA and CPSC each outlined "general protocols" for glove box testing in reports, there was no specific protocol for setting up the glove box testing.[112]

The Court finds that the glove-box testing procedure is reliable. The "glove-box method is commonly utilized in various other experiments . . . and the technique enjoys general acceptance within the scientific community."[113] Specifically, the glove box testing is utilized by individuals in the scientific community to analyze asbestos-fiber release.[114] Dr. Millette's

---

[108] *Id.*

[109]  Rec. Doc. 147-27 at 3.

[110] Rec. Doc. 47-1 at 13.

[111] Rec. Doc. 147 at 21.

[112] Rec. Doc. 47-1 at 13.

[113] *Barabin v. Scapa Dryer Fabrics, Inc.*, No. C07-1454JLR, 2018 WL 840147, at * 8 (W.D. Wash. Feb. 12, 2018).

[114] *Id.* ("This technique can be—and subsequently was—tested by others who also utilized glove-box

procedure regarding the glove box was modeled after protocols set forth by the Consumer Product and Safety Commission and the Environmental Protection Agency in their testing of asbestos products.[115] Accordingly, the glove-box testing procedure satisfies *Daubert*.

Amchem criticizes Dr. Millette for failing to conduct his tests in circumstances that reflect the conditions at Decedent's workplace.[116] Specifically, Amchem contends that the EPA and CPSC glove box tests did not measure personal exposure to airborne asbestos, but instead studied whether asbestos would be released from certain products.[117] Amchem argues that the EPA study specifically cautioned that further analysis was necessary before any predictions could be made about personal breathing zone exposures to asbestos based on their glove box tests.[118] Therefore, Amchem contends that there is no reliable scientific basis for making the connection between the results of the glove box tests and Decedent's breathing zone exposures.[119] Plaintiffs first respond that one of the determinations the jury will be asked to make is whether asbestos would be released from certain products, which is precisely what the glove box tests show.[120] Plaintiffs also state that Amchem's expert, Dr. Paustenbach, has merely offered his *opinion* that glove box results cannot be used to estimate worker exposures; Plaintiffs contend that this opinion is incorrect.[121]

---

techniques to analyze asbestos-fiber release.").

[115] Rec. Doc. 147-15.

[116] Rec. Doc. 47-1 at 13–14.

[117] *Id*.

[118] *Id*. at 14 (citing Rec. Docs. 47-5, 47-6 ("Means should be developed for relating the data provided by this technique [glove box tests] to worker and environmental exposures.")).

[119] Rec. Doc. 47-1 at 13–14.

[120] Rec. Doc. 147 at 21.

[121] *Id*.

The Court finds that concerns over dissimilarities between testing conditions and actual conditions go to the weight of the evidence rather than its admissibility. The fact that Dr. Millette's tests do not purport to create the exact scenario Decedent faced at Avondale do not render his tests unreliable and thus does not mandate exclusion. Whether any asbestos would be released from Benjamin Foster 81-27 adhesive is one piece of foundational information the jury can apply to Decedent's situation. The Court finds that Dr. Millette's tests "conducted in more confined working environments will nonetheless be of 'some use' to the jury in setting the upper-bounds of [Decedent's] possible exposure to asbestos from any one particular activity."[122] Therefore, Dr. Millette's glove box tests are sufficiently reliable to satisfy Rule 702 and *Daubert*.

Nevertheless, while the Court finds that Dr. Millette may testify as to his glove-box tests that were not substantially similar to Decedent's work environment, the Court will require that those tests be put in the proper context.[123] For example, it would be unreliable for Dr. Millette to testify that tests conducted in a glove box represents the likely exposure Decedent had from performing a particular activity without making a threshold showing that those tests took place under conditions substantially similar to Decedent's working conditions.

Next, Amchem argues that Dr. Millette's room scale test is also unreliable because the

---

[122] *Bell v. Foster Wheeler Energy Corp.*, No. CV 15-6394, 2016 WL 5916304, at * 2 (E.D. La. Oct. 11, 2016) (J. Affrick).

[123] *See, e.g., id.* ("Notwithstanding the Court's approval of most of Dr. Millette's proposed testimony, the Court does have one remaining concern. Though the Court believes that Dr. Millette can testify as to laboratory studies that were not substantially similar to Mr. Bell's working environments, the Court will require that (1) those studies be put in the proper context, and (2) the plaintiffs will not be able to use Dr. Millette's testimony as a subterfuge to speculate as to Mr. Bell's working conditions. It is neither reliable nor permissible for Dr. Millette to testify—as he suggests in his expert report—that the studies conducted in wholly disparate working environments represents the likely exposure Mr. Bell had from performing a particular activity on a ship."); *Quirin v. Lorillard Tobacco Co.*, No. 13-2633, 2014 WL 904072, at *4 (N.D. Ill. 2014) ("Based on these estimates, Dr. Millette will testify as to what type of exposure Mr. Quirin could have had under different assumed conditions.  As long as these opinions are grounded in Dr. Millette's own studies and relevant research he has reviewed, and as long as Dr. Millette does not speculate about facts with which he is unfamiliar, such as the frequency and duration of exposure Mr. Quirin actually experienced, the testimony is admissible.").

filters used in that test indisputably were overloaded.[124] Plaintiffs contend that the fact that a filter is overloaded does not invalidate the study and NIOSH does not prohibit the reporting of a fiber concentration when a filter is overloaded.[125] Dr. Millette testified that NIOSH does not prohibit the reporting of a fiber concentration when a filter is overloaded.[126] Dr. Millette further testified that the overloaded filters would lead to test results being underreported.[127] Lastly, Dr. Millette testified that other laboratories follow the same methodology for reporting and testing overloaded filters, though he could not recall any specific examples.[128] Based on the above, Dr. Millette's room scale test is sufficiently reliable to satisfy Rule 702 and *Daubert*.

Finally, Amchem argues that Dr. Millette's own quality-control measures demonstrate errors that render his test results unreliable.[129] Amchem contends that Dr. Millette sent portions of six air filters to Clayton Laboratory ("Clayton"), an outside service who performed repeat PCM analyses as a means of quality control.[130] Amchem contends that Clayton's results for all six samples were substantially different from Dr. Millette's results and that three of the six samples fell outside the NIOSH 7400 statistical parameters for repeat tests.[131] Plaintiffs argue that there is nothing unusual about the discrepancy between Clayton's sampling and Dr. Millette's sampling.[132] Plaintiffs contend that Clayton's findings still showed significant fiber release from

---

[124] Rec. Doc. 47-1 at 15.

[125] *Id*. at 22.

[126] Rec. Doc. 147-26 at 2.

[127] *Id*.

[128] Rec. Doc. 147-15 at 5.

[129] Rec. Doc. 47-1 at 16.

[130] *Id*. at 17.

[131] *Id*.

[132] Rec. Doc. 147 at 23.

Benjamin Foster's products and that if Amchem believes Dr. Millette's conclusions are wrong, they can cross examine him at trial.[133]

     As previously stated, the evaluation of an expert's conclusions falls to the jury. The fact that Dr. Millette's results were inconsistent with the results from the independent testing center goes to the weight of the evidence, not the reliability of his methodology. This issue may be raised by Amchem on cross-examination.

     Accordingly,

     **IT IS HEREBY ORDERED** that Amchem's "Motion to Exclude Tests Performed by Dr. James Millette on Benjamin Foster Products and Any Exposure Testimony Based Thereon"[134] is **DENIED**.

     **NEW ORLEANS, LOUISIANA,** this <u>11th</u> day of September, 2020.

                             *Nannette Jolivette Brown*
                             **NANNETTE JOLIVETTE BROWN**
                             **CHIEF JUDGE**
                             **UNITED STATES DISTRICT COURT**

---

[133] *Id.*

[134] Rec. Doc. 47.